## THEODORE SHUTE, Executor, *v.* W. W. DODGE et al.

The captain of the steamer Concordia, who is part owner, had an insurance in an office, of which *Snethen* was the agent. The boat was sunk; the captain abandoned, and *Snethen* refused to accept the abandonment. The captain then made a contract with *Snethen*, as the agent of a bell boat, to "save the cargo and other property from the wreck, in con-

sideration of the salvage hereafter to be agreed upon, by certain named arbitrators, and the free and full possession of the wreck." The bell boat raised the steamer and brought it to New Orleans, where it was sold by the port wardens. The owner of the bell boat bought it, and had it repaired  *Held:* The sale, by the port wardens, was illegal, and the purchaser acquired no rights by the purchase.

The circumstance, that the owner of the bell boat raised the steamer, by means of his boat, gave him no right to possession of the steamer.

The stipulation in the contract, that the captain of the bell boat should have "free and full possession of the wreck," meant nothing more than a possession or holding for the purpose of saving the cargo and property, and the exclusion of all interference with his wreck ; but not a possession adversely to the owners.

The purchaser had no right to have the steamer repaired at the expense of the owners, and they are only responsible for those repairs, to the extent that they are benefitted.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge,* J. *Benjamin* and *Micou,* and *Bonford* and *Finney,* for plaintiff.  *Ogden* and *Duncan,* for the defendants.  By the court :  *(Slidell,* J., absent.)

EUSTIS, C. J.  The questions upon which this case has been made ultimately to turn, relate to certain claims set up by the defendant, *Dodge,* on the proceeds of the sale of the steamer Concordia.  The learned judge of the district court describes the case as troublesome and intricate beyond any one which has ever passed through his hands.  In deciding it, we must endeavor to simplify it as much as possible; every thing which has not a serious bearing upon the result, must be kept out of view.

This appeal is taken by the defendant, and the plaintiff asks a change in the judgment in his favor.

The plaintiff represents the owners of two-thirds of the steamer Concordia, of this port ; her captain, *S. B. Frost,* owned the other third.  She was snagged a short distance above Fort Adams, on Sunday the 17th of October, 1850.

*Frost* was insured for five thousand dollars, with the Columbian Insurance Company, of which *Mr. Snethen* was the agent, and abandoned as for a total loss ; the abandonment was not accepted.

The cargo of the steamer was very valuable, and the captain made a contract with *Snethen,* as the agent of a bell boat, to save the cargo and other property from the wreck, in consideration of the salvage hereafter to be agreed upon by certain named arbitrators, and the free and full possession of the wreck.

Not only the cargo was saved, but the boat was raised and brought to New Orleans, on the 16th of November.  She was sold by the port wardens, and bought by *Dodge,* the owner of the bell boat.  She was then put into *Salter* and *Marcy's* dock, for repairs, was sequestered in this suit, and, after the first judgment rendered in the suit, was sold under the agreement of all concerned, and produced the sum of $8000, which is now before us for adjudication.

The plaintiff, at the time of the accident, was building a new boat at New Albany, and under date of the 31st October, writes a letter to *Capt. Frost,* in which he says, after noting the misfortune of the Concordia :

"I can now say nothing in relation to the course you should take with the wreck and whatever can be saved.  I feel satisfied that you will act for the best interest of all parties, and under advice or instruction from the offices.  There are many articles of furniture which we can use on the M, which I would like to have, but which will not be wanted now.  I should prefer the sale of everything postponed until I get down ; but the boilers and machinery might be shipped at once to New Albany, to *Phillips, Hise & Co.,* to be landed at their

foundry; if this can be done, I would advise it, as the best means of selling it to advantage."

This letter was received by *Capt. Frost* on the 9th of November, and shown to *Mr. Snethen* on that day.

Assuming that the captain, for the preservation of the steamer and her cargo, had full power to do what a wise and prudent man would think most conducive to the benefit of all concerned, during the existence of the necessity for his exercising his power. When we read this letter, and consider the circumstances in which the captain found himself, we cannot entertain a doubt that it conferred on him authority to act according to his best judgment in relation to the interests of the writer, and justified him in making any lawful contracts or expenditures called for by the exigencies of the occasion.

*Frost* was however insured, and had abandoned for a total loss. The plaintiff was not insured. *Frost's* interest was, that the steamer should not be saved, but that his abandonment and right of recovery should be fixed. At the same time he had his duty to perform, which was to act for the best interest of all concerned; a very awkward relation to occupy.

It appears, from the evidence, that *Snethen* was determined, from the beginning, to raise the boat, and that he had no directions from *Frost* to do any such thing. *Frost* acted on the reserve as to this project, and his interest was, that it should not be undertaken. *Snethen* knew this, but he was the agent of the bell boat and of the underwriters, and if he could convert this total into a partial loss, it would be money in the pocket of the underwriters; and it was further his interest to do the best he could for the bell boat, who would be engaged with her men on the spot, and obliged, in some sort, to prepare for the raising of the boat, by taking out her cargo.

*Frost* made no contract, and would make none to raise the boat, and the affair was *Snethen's* own, for the benefit of parties whom he represented, and not of the plaintiff. These are the conclusions we have come to, from the testimony of both *Frost* and *Snethen*.

*Frost* says, that he never made any objection to her being raised, but did not want her raised. His idea was, to have the machinery taken out and shipped to New Albany or Louisville, where steamboats are built, according to the plaintiff's instructions. *Snethen* acted with his eyes open, according to his views of the interest of those whom he represented. The plaintiff was absent, and *Frost* declined acting for him, in making any agreement as to the raising of the boat.

The hull of the steamer was not worth the expense of saving. They all knew this, and *Snethen*, under this state of facts, had the boat raised and brought to New Orleans.

Although *Frost* was silent as to the doings of *Snethen* and the workmen, in raising the boat, yet nobody was deceived by it, still less *Snethen*, who can gain no advantage from the position of *Frost*, which he created, by not accepting the abandonment of his interest insured.

The district judge considered the claim for raising the steamer, and bringing her to New Orleans, exclusively as one of salvage, and adjusted it on the principles of marine salvage. He thought he was allowing all that could rightfully be asked, in giving *Dodge*, the owner of the bell boat, one-half the proceeds of the steamer, resulting from the sale by the port wardens, on the 24th November, to wit, one half of $3650.

SHUTE
v.
DODGE.

We are not satisfied that the case is one to which the principles of marine salvage are applicable, nor that the facts constitute the ingredients of what we held in law, to be salvage services; but this objection is only to the principle of the adjustment, which, under the circumstances, we would, in an ordinary case, consider inapplicable. But the defendant has no right to complain of this mode of adjustment, for *Snethen* undertook the business, on the exclusive footing of salvage. He told *Frost*, "if the diving bell boat succeeded in raising the Concordia, the boat would be entitled to salvage ; if she failed, it would be her own loss." He made a salvage adventure, exclusively so, and had no right to expect, and did not expect, any other mode of reimbursement.

It has not been attempted to defend the sale of the steamer, by the port wardens, and it follows, of course, that *Dodge* could acquire no rights by his purchase. Nor do we consider, that he had, in any legal sense, the right of possession of the steamer, from the circumstance of having raised her by means of his boat.

We understand the free and full possession of the wreck given to him by the contract, as meaning nothing more than a possession, or holding, for the purpose of saving the cargo and property, and the exclusion of all interference with his work, and not a possession adversely to the owner.

It seems to follow, from these premises, under the facts established, that *Dodge* had no right to have the steamer repaired, at the expense of the plaintiff; and that he is only responsible for the repairs, as he, or the steamer, was benefited by them.

*Marcy*, who repaired her, says, her hull was worth nothing before she went into dock, and after the repairs, which cost $2100, she was worth $2500. Four hundred dollars were gained by the repairs, and the plaintiff is chargeable with two-thirds of the cost of repairs, say of $2137 03.

The amount allowed by the district judge, for raising the boat and bringing her to New Orleans, is $1216 66.

Our impression, throughout this investigation, has been, that the plaintiff could be subjected to no charge in all this business, unless it inured to his benefit. The evidence is quite defective as to some points, which would have enabled us to bring the subject to some accurate test. Had the amount insured on cargo been proved ; had the daily usual earnings of the boat been in evidence, we then might have ascertained what other interest there was which was operating in throwing these charges upon the plaintiff, and to what extent the time of the boat had been paid for by the $4000 allowed for saving the cargo. No details of the mode in which this account was adjusted were given.

So far as the plaintiff's interests were concerned, *Snethen* was, throughout, a volunteer, acting for the interests of those he represented. In serving them he aided the plaintiff most unquestionably, but we think it ought to be shown, as nearly as it was susceptible of proof, to what extent the expenditures incurred inured to the benefit of the latter. The repairs put upon the boat by *Salter* and *Marcy*, inured to his benefit, and he must bear his share of them. That something is due for the other works, we think is clear; but great uncertainty rests upon the beneficial result of most of the charges.

Neither party asks the case to be remanded. It was incumbent on the defendent, in reconvention, to prove the extent to which the expenditures inured to plaintiff's benefit, in order to charge him with them in this distribution of the proceeds of the steamer.

After a thorough examination of the subject, we are satisfied that the judgment of the district court, as an equitable adjustment of these very complicated relations, is as near the justice of the case as we can come, by any consideration in detail, and ought to be affirmed.

The judgment of the district court is therefore affirmed with costs; the costs of the court below to be paid out of the proceeds of the sale.

PRESTON, J., dissenting. The steamboat Concordia was sunk near Fort Adams, on the 15th of October, 1850, in eight feet water and six feet mud. Seven days afterwards, and when a rise of water was anticipated, which would have rendered it impossible to raise and save the wreck, an agreement was made with *Dodge*, the owner of a steamboat with diving bell and submarine apparatus, to save the cargo; and, I think, by a fair and liberal construction of the agreement, was to save the wreck also if possible. What other meaning can be given to terms in the agreement, to give him the free and full possession of the wreck under water? At all events, it cannot be disputed that, a few days afterwards, those interested in the property who were present in the State, employed him to raise and save the wreck, and the agents of all acquiesced. And furthermore, it is not to be admitted that any of them interested, from motives growing out of insurance, should be indulged in letting her go to destruction while there was a possibility of saving her; and the implied consent of all to raise and save the boat is to be presumed.

The salvage, upon any of these hypothesis, was to be settled and fixed by arbitrators, appointed by the parties in advance, that there might be no suspicion of bias. The record satisfies me that all parties interested, expressly or by silence assented to this arrangement.

*Dodge* raised, saved and brought the wreck to New Orleans. The arbitrators agreed upon, awarded him three thousand dollars salvage, amounting to about his expenses, all of which he would have lost if he failed in his enterprise. I am not convinced, by the evidence, that this sum was by any means half the value of the boat floating, with her engine and machinery on the surface of the water. Even if it was more, I look upon the boat, engine and machinery at the bottom of the Mississippi and six feet in mud, as substantially a derelict. If half the value be allowed for taking up a derelict, floating on the surface, that or more might be allowed for diving to the bottom, making the fastenings and bringing the derelict, by herculian efforts, from beneath the bottom, for she was in the sand, taking her safely to New Orleans, and restoring her to commerce.

Salvors cannot *exor termini* bring the owners in debt—a result the district judge much feared; but such circumstances as existed in this case may leave them but little. Witnesses have been examined to show the value of the engine and machinery, if raised and taken to Louisville or Cincinnati. I doubt if they would have sold for much at the bottom of the Mississippi, near Fort Adams. If so available at Louisville, why did not the owners keep and use it, with their boat, when set afloat, by paying the mere expenses of raising her, allowed as salvage?

I do not believe the whole would have sold for much, at the bottom of the river. By the labor, expense, and I may say risk of life, the salvors have saved something for all the owners. Their reward has been fixed by judges appointed by those owners at barely the expense, the whole of which was risked on the event of success, as well, perhaps, as the health and lives of those employed above and under water in the enterprise. The district judge has brought the salvors greatly in debt under such circumstances.

SHUTE
*v.*
DODGE.

I think his judgment should be reversed, and the whole amount of the salvage awarded by the arbitrators, selected by the parties, should be paid out of the money in court.